PEOPLE v. LAY.

1. CRIMINAL LAW—PLEA IN ABATEMENT—PLEADING—COURT—BIAS OR INTEREST.

A party who interposes a dilatory plea in a prosecution for a criminal offense invites the most rigid scrutiny of its sufficiency, under the well established rules of pleading; and, therefore, a plea in abatement to an indictment for embezzlement, which pleaded the fact that the circuit judge had been employed as an attorney by some of the creditors of the corporation, of which respondent was one of the vice presidents, and was pecuniarily interested in the result of the prosecution, was not sufficient, where the evidence showed that the relation between the judge and the creditors had terminated before he called the grand jury, since the indictment does not place the respondent in jeopardy, but is preliminary to the hearing:

also, under the statutes of Michigan, the accused is limited to the one ground of objection, viz., that some one summoned to serve is prosecutor or complainant against him.

2. SAME—DISQUALIFICATION OF JUDGE.

And where the circuit judge, who was later called to hear the case, was incapacitated by a similar disqualification, but the presiding judge overruled the motion for a change of venue, calling in another circuit judge to hear the case on the merits, the accused waived any right to object to having the judge act as substitute in arguing the plea without objection before him.

3. SAME—BILL OF PARTICULARS.

Where a bill of particulars was filed in a criminal proceeding covering the embezzlement of $12,000 of so-called salary, and also covering a further embezzlement of $25,000 for another year, but the trial proceeded throughout in relation to the year 1913, when he received the larger amount of salary, a request to instruct the jury that no claim was made under the bill of particulars for the $25,000 salary, and the evidence about the same could only be considered as bearing on his intent in receiving the $12,000, was correctly refused, for the reason that it was not presented until after the arguments were completed and the case had been tried and argued on a contrary theory.

4. SAME—EVIDENCE—PRIVILEGE—BANKRUPTCY.

While testimony in a criminal prosecution, showing the sworn statements of respondent upon examination in bankruptcy proceedings of the corporation of which he was an officer, should have been excluded because it was privileged, it could not be said to have prejudiced the accused who afterwards went on the stand and gave testimony relative to the same facts.

5. SAME—SALARY—DEFINITION.

A salary is defined as a periodical allowance made as compensation to a person for his official or professional services or for his regular work.

6. SAME—CONSPIRACY—EMBEZZLEMENT—CORPORATIONS—OFFICERS.

Under a charge that respondent and other officers of a corporation had conspired together to wrongfully and secretly convert to their own use funds of the corporation,

in form of excessive salaries, the evidence showing the taking of the money, and that it was authorized by the conspiring officials, and they, with accused, were in control of the corporate funds, presented an issue which the court rightly submitted to the jury.

7. SAME—INSTRUCTIONS TO JURY—FRAUDULENT INTENT.

And upon proofs that respondent received a large and unauthorized salary, which was charged on the books to a fictitious account, the court was right in charging the jury that the object of introducing evidence about the fictitious account was to show that the true account of the money which respondent received was secreted, but the evidence could not be considered unless the jury also found that the money was so charged with the knowledge and consent of respondent, or with the knowledge and consent of others with whom he was knowingly co-operating in committing the offense.

8. SAME—CONSPIRACY—KNOWLEDGE.

Where two or more conspire together to commit an actionable wrong everything said, done, or written by any one of them in the execution or furtherance of the common purpose is deemed to be said, done, or written by everyone, and is a relevant fact as against each.

9. SAME—INSOLVENCY OF CORPORATION—EVIDENCE—INTENT.

But evidence as to insolvency of the corporation stood upon a different footing: though respondent joined in a report of its annual condition to the State, showing serious impairment of the capital, the report was not conclusive, when he denied knowing its contents and claimed he had not read it and did not know of the alleged insolvent condition.

10. SAME—CONSPIRACY—KNOWLEDGE—INSTRUCTIONS.

And where the court charged that if the jury found the corporation was insolvent when his salary was increased, that was not to be considered as indicating bad faith unless he knew of the condition, or unless others with whom he was acting in concert knew of the insolvency, the error was prejudicial and reversible, and it was improper to permit the jury to consider the knowledge of the other conspirators as proof of the motive and intent of the accused.

Exceptions before sentence from Kalamazoo; North, J., presiding. Submitted April 14, 1916. (Docket No. 130.) Decided December 21, 1916.

George T. Lay was convicted of embezzlement. Reversed.

*Grant Fellows*, Attorney General, and *Frank F. Ford*, Prosecuting Attorney (*Charles W. Nichols*, of counsel), for the people.

*Claude S. Carney* and *William W. Potter*, for respondent.

PERSON, J. Respondent was indicted jointly with his brother, Frank B. Lay, Jr., and one Victor L. Palmer, for the alleged embezzlement of a considerable sum of money from the Michigan Buggy Company, a corporation doing business in the city of Kalamazoo. The indictment was returned by a grand jury sitting in and for the county of Kalamazoo, on the 15th day of January, 1914. Separate trials were claimed by the several defendants named therein, and in April, 1915, respondent was convicted of the offense charged. He brings the case here upon exceptions before sentence.

Previous to the trial of respondent, his brother, Frank B. Lay, Jr., had been tried and convicted upon the indictment, and his case has been before this court, and was disposed of by an opinion which will be found *ante,* 17 (159 N. W. 299). That opinion contains a very full statement of the facts, which are substantially the same in the two cases. In this opinion such only will be given as are necessary to an understanding of the points decided.

Respondent insists that the money which he is charged with embezzling was received by himself and others in good faith as salaries. The prosecution, on

the other hand, charge that it was fraudulently taken from the company without any regard to just compensation for services, and that it was termed "salaries" simply as a cover for the defalcation.

Respondent entered the service of the company in September, 1911, at a salary of $300 per month. Its officers at that time were M. Henry Lane, president, Victor L. Palmer, secretary, and respondent's father, Frank B. Lay, Sr., treasurer. These three owned all of the common stock of the company, and constituted its board of directors. A considerable amount of preferred stock was outstanding, but it had no part in the control of the company. The larger portion of the common stock was held by the senior Lay and Lane in about equal proportions; the amount held by Palmer being less than that held by either of the others. Frank B. Lay, Jr., had been employed by the company for some time and at a salary not exceeding that paid respondent.

Just prior to the annual meeting of the company's stockholders in April, 1912, respondent and his brother had each been given a small amount of stock so that they might participate in the meeting. At the meeting respondent and his brother were made directors of the company, thus enlarging the board to five members. At the meeting of the directors, which soon followed, the senior Lay was made president of the company in the place of Lane who had held the office for many years, Palmer was elected its secretary and treasurer, and respondent and his brother were each made vice presidents. Mr. Lane was given the office of "chairman of the board." Before the annual meeting of the stockholders the salaries of the then existing officers had been fixed for the year by the directors. Mr. Lane, as president, was to receive $6,000, Mr. Lay, as treasurer, $6,000, and Mr. Palmer, $6,000, with an additional $6,000 at the discretion of the di-

rectors. It does not appear that any larger salaries had ever been paid during the many years of the company's existence. Shortly after the annual meeting, respondent, with his father, brother, and Palmer, held a conference at the Burdick House, in the city, and agreed that they would thereafter draw salaries as follows: The elder Lay $35,000 per year, including his dividends, Palmer $25,000 per year, and the two Lay brothers each $12,000. It seems that the dividends which Mr. Lay had been receiving prior to that time had amounted to about $11,000 annually. This conference was unknown to Mr. Lane, and he was not present. Nor was he aware of the alleged increase in salaries until after the company's failure. His own had not been changed. Neither is it shown that the preferred stockholders were ever told of the amounts being received as salaries by the parties to the conference. After that the salaries of respondent and his brother were again enlarged. From the 2d day of January, 1913, and until July of that year, by an agreement between themselves and Palmer, each drew at the rate of $25,000 a year. In August the company went into bankruptcy.

Prior to the agreement for the alleged increase in salaries respondent had been paid his $300 per month in two checks of $150 each. The others had received their salaries also by checks. For the purpose of proving the fraudulent intent with which the alleged increase in salaries was made by the parties to the agreement, it was shown that they continued to receive checks for the same amount as theretofore, but that the increase itself was paid to them by Palmer in cash, and that the cash so paid, instead of being entered in the salaries account on the books of the company, was charged partly to advertising, but mostly to a fictitious account in the name of "J. Roach & Co.,"

which appeared as an account receivable. This proof was objected to by counsel for respondent upon the ground that respondent was not shown to have had any actual knowledge either of the fictitious account or of the manner in which Palmer was concealing the payment of the increased salaries. It was also shown by the prosecution, as a motive for taking these alleged increased salaries, that the company was insolvent at the time, and its capital stock impaired to the extent of several hundred thousand dollars. This was shown in part by producing the company's annual report for the year 1912, in which the impairment of the capital stock plainly appeared. Although this report was signed by respondent, with his father, brother, and Palmer (but not by Lane), yet respondent denied all knowledge of its contents and all knowledge of the company's insolvency. For this reason the admission of the report and of other proofs of insolvency was objected to by respondent's counsel.

In August, 1913, as above stated, the Michigan Buggy Company was declared bankrupt. At nearly the same time the Honorable Nathaniel H. Stewart, who had long been a practicing lawyer in the city of Kalamazoo, was appointed circuit judge of the ninth judicial circuit, which includes the county of Kalamazoo. His appointment was made to fill a vacancy caused by the death of the regularly elected incumbent. Judge Stewart continued in office until the general fall election in 1914, when he was succeeded by Judge Weimer. During the period of Judge Stewart's incumbency, and at the November term of court in the year 1913, he ordered the summoning and impaneling of the grand jury that returned the indictment under consideration.

The errors assigned on this appeal fall into two general groups. The first relates to the summoning of the grand jury, the qualifications of its members,

and to matters preliminary to the trial of the case upon its merits. The other consists of errors alleged to have occurred at the trial in the admission of evidence, and as to instructions given or refused.

In this case, as in the one against Frank B. Lay, Jr., several pleas in abatement were interposed to the indictment. The first plea alleges that Judge Stewart, before he ordered the grand jury convened, and presumably before his appointment, had been employed as attorney by certain creditors of the Michigan Buggy Company to procure the allowance of their claims against that company. The second alleges that when he ordered the convening of the grand jury he was a stockholder in various corporations to which the Michigan Buggy Company was debtor. Because of these facts it is averred that he was disqualified to order a grand jury, and that all of its acts were therefore void, including the return of the indictment against respondent.

The third and fifth pleas relate to the competency of certain of the grand jurors. By the third it is charged that several of them were stockholders in banks which were creditors of the Michigan Buggy Company and held its commercial paper guaranteed by respondent. One of the grand jurors is said to have been a director in such a bank. The fifth plea charged that the circuit judge, who had, himself, been employed by creditors of the Michigan Buggy Company, and who was a stockholder in various corporations to which the company was indebted, caused the official stenographer of the court to be placed upon the grand jury as a talesman, and that the stenographer had done various things, recited in the plea, tending to show, it is alleged, his prejudice against respondent and an interest in his prosecution.

The fourth plea charged that the circuit judge set aside the lists of jurors that had been returned from

the several townships for the current year, and unlawfully caused the grand jury to be drawn from new lists which were returned by his order. This action of the circuit judge is charged to have been unwarranted, inasmuch as the original lists had never been declared illegal. And it is averred that because of this action of the circuit judge the grand jury was not a lawful body, and was not authorized to find the indictment against respondent.

The pleas contain many inferences of the pleader not warranted by the facts stated. As was said in *People* v. *Lauder*, 82 Mich. 109 (46 N. W. 956), under similar circumstances:

"A party interposing such dilatory plea invites the most rigid scrutiny of its sufficiency under the established rules of pleading."

Considered in the light of this rule, the pleas do not show that either Judge Stewart or any of the grand jurors had a pecuniary interest in the indictment or conviction of respondent. So far as concerns any facts stated, the judge's employment by the creditors of the Michigan Buggy Company terminated before he called the grand jury. It is urged that he and the grand jurors referred to in the third plea were interested as stockholders in the creditor corporation, because such testimony as would convict respondent would also establish the claims of the several corporations in civil proceedings against him. It was not averred that any civil proceedings were pending or contemplated. And it is not shown how such civil proceedings would be advanced or benefited by respondent's indictment and conviction. In *State* v. *Rickey*, 10 N. J. Law, 83, a plea to an indictment was held bad which averred that one of the grand jurors was a stockholder in the bank whose funds the respondent was charged with embezzling.

Certainly Judge Stewart would not have been disqualified to call a grand jury even if he had been interested in respondent's indictment. A grand jury is convened for the general purpose of investigating all such charges of crime as may be brought to its consideration. And it cannot be claimed that a judge's interest in the prosecution of some particular offender would disqualify him from ordering a grand jury for the purpose of inquiring into offenses generally.

But there is a more complete answer, and it applies to all of the pleas in abatement. The action of a grand jury does not place the accused in jeopardy, in any legal sense, and is merely preliminary to a trial upon the facts. It is not in the interest of justice that its proceedings should be treated in any captious or technical manner. The statutes of this State have therefore limited the accused to a single ground of challenge, namely, that some one summoned to serve upon the grand jury is a prosecutor or complainant against him. This applies as well to the array as to any single juror. 3 Comp. Laws, §§ 11881, 11882 (5 How. Stat. [2d Ed.] §§ 15052, 15053, 3 Comp. Laws 1915, §§ 15708, 15709). The effect of this statute has been considered in a variety of cases. *People* v. *Lauder, supra; People* v. *Smith,* 118 Mich. 73 (76 N. W. 124) ; *People* v. *Reigel,* 120 Mich. 79 (78 N. W. 1017) ; *People* v. *Thompson,* 122 Mich. 411 (81 N. W. 344) ; *People* v. *Morgan,* 133 Mich. 550 (95 N. W. 542) ; *People* v. *Salsbury,* 134 Mich. 537 (96 N. W. 936) ; *People* v. *Lay, supra.* The last case fully explains what is intended by the statute when it refers to "prosecutor" and to "complainant"; and in the light of that explanation it cannot be said that any grand juror in this case was either the one or the other. The pleas therefore should have been, as they were, overruled.

Although, as has been shown, the pleas should have been overruled for lack of merit, yet it is insisted that

Judge Weimer was incapacitated from passing upon them, and that his order by which they were overruled was wholly void and, of no effect. This contention is based upon the charge that Judge Weimer, as well as Judge Stewart, had been attorney for various creditors of the Michigan Buggy Company in proceedings to collect their demands. After he had disposed of the pleas respondent filed a petition asking for a change of venue and that some other judge be called in to hear interlocutory proceedings. It was alleged in the petition that Judge Weimer had been attorney for various creditors, as hereinbefore stated, and that in one of those proceedings the insolvency of the company was a material issue, as it was in this case. Upon the filing of the petition the judge denied the application for a change of venue, but called in Judge North from another circuit to preside at the trial of the case upon its merits. Respondent had argued the pleas before Judge Weimer without objection, and went to trial before Judge North without suggesting the invalidity of the order by which they were overruled. Now, founded upon that same petition, and after he has been convicted upon the merits of the case, respondent makes the claim that the verdict and conviction should be set aside so that he may have another adjudication upon the merits of his pleas. We do not consider it necessary to pass upon Judge Weimer's alleged disqualification to act in this case. Respondent had the right to file the dilatory pleas, or not to file them, as he chose. And he had the same right to waive a hearing upon them that he had to refrain from filing them in the first place. We are not passing upon his power to waive the disqualifications of the judge, but to waive a hearing upon the pleas. When he went to trial before Judge North he knew every alleged disqualification of Judge Weimer, as well as he does now. The petition upon which he founds

his present contention had been filed long before. If he thought that the order made by Judge Weimer overruling the pleas was void, he could have insisted that they be passed upon by some competent judge before engaging in the trial upon the merits. Not having done so, he must be held to have waived all right to insist upon them now.

In passing upon the errors alleged to have occurred upon the trial of the case, we will first consider the one relating to the bill of particulars. There were two indictments for embezzlement, it seems, returned against respondent jointly with his brother and Palmer. He was tried under the one which alleged embezzlement of the company's money during the period when he was receiving the alleged salary at the rate of $25,000 per year. It is stated in the brief of counsel for the people, and is not disputed by respondent, that the other indictment covered the period in the year 1912, when he was receiving the alleged salary at the rate of $12,000 per year. After the testimony upon the trial had been received and the arguments closed, counsel for respondent called the attention of the court to a bill of particulars covering the period in 1912, and requested that the jury be instructed as follows:

"A bill of particulars has been filed in this case. No claim is made in that bill of particulars of the embezzlement of the $25,000 salary. The people's claim is limited to the salary of $12,000. The fact that respondent received the increase from $12,000 to $25,000 can be considered by you only as bearing upon the intent with which he received the $12,000."

The court refused this request and noted thereon in writing the following reason:

"This request is refused, because it was not presented until after the arguments were completed. The case was tried throughout and argued to the jury by defendant's counsel on a contrary theory, and the at-

torneys representing the people claim a proper bill of particulars was served on defendant's counsel."

After a careful examination of the record we are satisfied that the court was right. The trial throughout was for embezzlement alleged to have taken place in the year 1913, and if the bill of particulars was intended to apply to this case respondent waived all right to rely upon it.

Previous to his indictment respondent had given testimony before the referee in bankruptcy upon an examination into the affairs of the Michigan Buggy Company. Against his objection that testimony was read to the jury in this case. This is assigned as error. The same question arose in *People* v. *Lay, supra,* and it was there held that such testimony was incompetent because of the immunity granted by the Federal statute. We see no reason for modifying the conclusion there reached, and the testimony should have been excluded. But in this case it is apparent that respondent could not have been prejudiced by its admission, inasmuch as he himself afterwards went upon the witness stand and substantially reiterated all that he had said before the referee. We have examined the testimony given by him in each instance, and are satisfied that he did this voluntarily, and not for the purpose of modifying or explaining anything that he had previously said. A party cannot complain that facts have been improperly proven when he himself voluntarily admits their truthfulness.

We now come to the most important question raised by this appeal. A "salary" is defined in Standard Dictionary as:

"A periodical allowance made as compensation to a person for his official or professional services or for his regular work."

That we believe to be the accepted meaning of the term. Undoubtedly an officer of a corporation may

receive an exorbitant salary without incurring criminal responsibility therefor, if it is authorized by competent authority, or received in good faith as compensation for services.

But in this case it is charged that respondent conspired with other directors and officers of the company, who had control of its property, to wrongfully and secretly convert its funds to their own personal uses; that in so doing they were not governed by the idea of compensation, and that they called the moneys so taken "salaries" only as a cover for their defalcations. If the charge is true, their conduct comes fairly within the terms of the statute under which they were indicted. That statute, so far as its provisions are here important, reads as follows:

"If any officer * * * of any * * * incorporated company * * * shall embezzle or fraudulently dispose of or convert to his own use * * * without consent of his employer or master, any money or other property of another, which shall have come to his possession, or shall be under his charge by virtue of such office or employment, he shall be deemed by so doing, to have committed the crime of larceny." 5 How. Stat. (2d Ed.), § 14614; 3 Comp. Laws, § 11565, as amended by Act No. 102, Pub. Acts 1905, 3 Comp. Laws 1915, § 15310.

The taking of the money is conceded. There is no claim that it was authorized except by the alleged conspirators themselves. And if they intended to wrongfully convert the company's money to their own uses, they had no authority, as directors or otherwise, to express the company's consent thereto. Nor have we any doubt that the money converted was in their possession, and in the possession of each of them, within the meaning of the statute. They were directors of the company charged with the control of its property, and the checks of each, when drawn upon its

funds, were honored without question. *People* v. *Butts,* 128 Mich. 208 (87 N. W. 224).

It is also admitted that the money was taken by an agreement between the parties named in the indictment; and whether this agreement amounted to a conspiracy to take the money wrongfully and illegally depends upon the purpose and intention of the parties. As proof of this intent the prosecution introduced evidence tending to show that what are called increased salaries were never entered as such upon the books of the company; that Palmer drew the money with which they were paid from the local banks on checks drawn to "cash," and that the money so drawn and used by him was charged to a fictitious account which appeared upon the books as an account receivable. It was also shown that when the money covered by this indictment was taken the company was insolvent in the sense that its capital stock had been impaired to the extent of several hundred thousand dollars. There was no direct evidence showing respondent's knowledge of the method used in obtaining the money, or of the way in which it was entered upon the books, and the proof offered of these matters was duly objected to by his counsel. It was shown that respondent signed the company's report for the year 1912, by which the impairment of its capital was admitted; but he denied any knowledge of the contents of the report, and any knowledge of the company's insolvency. In relation to these matters, and to their admissibility as bearing upon respondent's intent, the court instructed the jury as follows:

"Evidence has been introduced tending to show that the account of the money paid to the defendant was kept in two separate and distinct accounts, namely, the pay roll account and the account of J. Roach & Co. The only object for introducing the account of J. Roach & Co. is to show that the true account of the money

paid the defendant was secreted, but you cannot consider that element in the case unless you shall find that that money was kept in the J. Roach & Co. account with the knowledge and consent of the defendant, or with the knowledge and consent of others with whom the defendant was knowingly co-operating in committing the offense with which he is charged. And so too of the matter of the insolvency of the company, if you find that to have been the condition at the time that arrangement was made for this increase in salary, that is not a circumstance which should be considered by you as indicating bad faith on the part of this defendant in accepting an increase in salary unless he knew of that unfortunate condition of the company at the time, or unless others with whom he was acting in concert to do this offense with which he is charged knew of the failing condition of the company."

Respondent assigns error upon these instructions, as well as upon the admission of the evidence referred to, and insists that neither the method of raising the money and entering it upon the books nor the insolvency of the company were competent proof of his bad intent, because never shown to have been actually within his knowledge.

It is true that the proofs do not bring home to respondent any actual knowledge of the "J. Roach & Co." account, or that the increased salaries were charged to that account. And, if there had been no other proof of his bad faith, it is undoubtedly true that Palmer's concealment of the salaries by means of that account could not have been used to show it. But there was other evidence of respondent's bad faith, and enough to justify the court in receiving this evidence upon the theory that a conspiracy had been shown to embezzle the company's money.

"Wherever two or more conspire together to commit an actionable wrong, everything said, done, or written by any one of them in the execution or furtherance of their common purpose is deemed to be so said, done, or written by every one and is a relevant fact as against each." *Hamilton* v. *Smith*, 39 Mich. 222.

And see *People* v. *Pitcher*, 15 Mich. 397; *People* v. *Saunders*, 25 Mich. 119; *People* v. *Arnold*, 46 Mich. 268 (9 N. W. 406); *People* v. *Salsbury*, 134 Mich. 537 (96 N. W. 936); *People* v. *McGarry*, 136 Mich. 316 (99 N. W. 147). The evidence of Palmer's method of raising the money with which to pay the alleged increase in salaries, and of the manner in which it was charged upon the books of the company, was properly received.

But the evidence as to the insolvency of the company is of a different character. It is true that respondent signed the annual report by which the impairment of its capital was shown, and the report was therefore admissible, but it was not conclusive as to his knowledge of the company's condition. He says he never read the report, and did not know what it contained, and did not know of the company's insolvency. This raised a question of fact for the jury. If they believed that he did know of its precarious condition, they had the right to take that knowledge into consideration in determining his purpose and intent in agreeing to the alleged increase for the others and in receiving the alleged increase to his own salary. But he could not be charged with the knowledge of the others. The court made the mistake of confounding what the others did in carrying out the conspiracy, if there was one, with what they knew when they went into it.

One conspirator is chargeable with the acts of the others upon the principle that governs in case of agency, but that does not make him responsible for the antecedent knowledge of the others. It was not vital to the case that respondent's knowledge of the company's insolvency should have been established. The property of a solvent corporation may be embezzled, as well as the property of an insolvent one. But knowledge that the company was in a failing condition

may have been considered by the jury as strong proof of respondent's motive and intent, and we cannot know what their conclusion would have been if they had found such knowledge not possessed by nor imputable to him.

For this reason, the conviction is set aside, and a new trial ordered.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.